**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

CLARA REECE FULLER,

        Plaintiff,

vs.

ALLIANT ENERGY CORPORATE
SERVICES, INC.,

        Defendant.

No. C 05-92-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

———————————

**TABLE OF CONTENTS**

**I. INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   **A. Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   **B. Factual Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      *1. The pertinent record* . . . . . . . . . . . . . . . . . . . . . . . . . 5
      *2. Background to Fuller's employment* . . . . . . . . . . . . . . . . 7
      *3. Absenteeism* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      *4. Harassment and disparate treatment* . . . . . . . . . . . . . . . 16

**II. LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   **A. Summary Judgment Standards** . . . . . . . . . . . . . . . . . . . . . . . 19
   **B. Failure To Exhaust Administrative Remedies** . . . . . . . . . . . . . . 23
      *1. Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 23
      *2. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   **C. Fuller's Sex Discrimination Claim** . . . . . . . . . . . . . . . . . . . . 27
      *1. Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 28
      *2. Sufficiency of Fuller's* **prima facie** *case* . . . . . . . . . . . 29
         *a. Qualification* . . . . . . . . . . . . . . . . . . . . . . . . . 30
         *b. Different treatment* . . . . . . . . . . . . . . . . . . . . . 32
      *3. Pretext and inferences of discrimination* . . . . . . . . . . . 33
   **D. Fuller's Race Discrimination Claim** . . . . . . . . . . . . . . . . . . . 35

      1.     *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . . 36
      2.     *Adequacy of Fuller's* **prima facie** *case* . . . . . . . . . . . . . . 37
      3.     *Pretext and inferences of discrimination* . . . . . . . . . . . . . 40
   **E.** **Fuller's Disability Discrimination Claim** . . . . . . . . . . . . . . . . . . . . 42
      1.     *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . . 43
      2.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
         *a.*    *Abandonment of the claim* . . . . . . . . . . . . . . . . . . . . 43
         *b.*    *Sufficiency of the claim under the ADA* . . . . . . . . . . 44
         *c.*    *Sufficiency of the claim under the FMLA* . . . . . . . . . 45

**III.  CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

This action involves the plaintiff's claims of discrimination on the basis of race, sex, and disability against her former employer. The employer seeks summary judgment on the grounds that the plaintiff was not disabled; was not qualified for her position or any other position that she sought owing to excessive absenteeism; did not suffer any adverse employment action when her employment ended, because she abandoned her job rather than provide adequate documentation to support her claims for bereavement or other leave; and cannot demonstrate that the employer's explanation for its actions—that the employer was responding appropriately to the plaintiff's abuse of the employer's leave policies—is a pretext for discrimination. The plaintiff counters with a litany of allegations of unfair treatment, which she apparently contends demonstrates a discriminatory animus behind all of the defendant's actions. Thus, the court must determine whether or not the plaintiff has generated genuine issues of material fact on her claims that would preclude summary judgment in the defendant's favor.

## I. INTRODUCTION

### A. Procedural Background

Plaintiff Clara Reece Fuller, who is prosecuting this action *pro se*, filed this action on September 27, 2004, against her former employer, Alliant Energy, in the United States District Court for the District of Kansas, Kansas City Division.[1] Fuller alleges that she suffered sex, race, and disability discrimination and has identified the categories of discriminatory action, generally, as termination of employment, failure to promote, unequal terms and conditions of employment, reduction in wages, retaliation, and "other acts." Complaint (docket no. 40, Kansas District Court docket no. 4), at 3. After various proceedings, of no consequence to the present ruling, a judge of the Kansas federal court entered an order on May 18, 2005, granting the defendant's Motion To Dismiss Or, In The Alternative, Transfer Due To Improper Venue to the extent that this action was transferred to this court.

On March 8, 2006, the defendant moved for summary judgment (docket no. 72), and after an extension of time to do so, Fuller resisted that motion on May 1, 2006 (docket no. 76). On May 3, 2006, the then-presiding judge recused herself on the basis that the defendant had identified in its Local Rule 3.2 and 81.1 Statement of Interest an association between the defendant and an entity listed on that judge's "conflicts list." Therefore, this matter was reassigned to the undersigned. *See* Recusal Order (docket no. 77).

Upon the undersigned's review of the newly-assigned case, the undersigned noted that, in its motion for summary judgment, Alliant had identified Fuller's claims as discrimination on the basis of race, in violation of Title VII of the Civil Rights Act of

---

[1] Both the United States District Court for the District of Kansas and this court have denied Fuller's motions for appointment of counsel.

1964, and illness or disability, in violation of the Americans with Disabilities Act (ADA), and that it was apparent that the defendant sought summary judgment on the entirety of the plaintiff's Complaint. The court, recognizing the requirement "that pro se complaints be construed even more liberally than counseled pleadings," *Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006), construed Fuller's *pro se* complaint to attempt to assert a claim of sex discrimination in violation of Title VII, as well as claims of race discrimination in violation of Title VII and disability discrimination in violation of the ADA. Therefore, by order dated May 5, 2006 (docket no. 78), the court established a schedule for the amendment and briefing of the defendant's March 8, 2006, Motion For Summary Judgment (docket no. 72), to address all three of the plaintiff's claims, which consist of claims of race *and* sex discrimination, in violation of Title VII, and disability discrimination, in violation of the ADA.

On May 19, 2006, Alliant filed an Amended Motion For Summary Judgment (docket no. 80), seeking summary judgment in its favor on all of Fuller's claims. Fuller filed an Amended Resistance To Defendant's Amended Motion For Summary Judgment (docket no. 85) on June 30, 2006. After an extension of time to do so, Alliant filed a Reply (docket no. 89) in further support of its motion for summary judgment on July 20, 2006. After the fact, Fuller objected to the court's order granting Alliant an extension of time to file its reply, and also objected to the court's May 5, 2006, order (docket no. 78), which had construed her complaint as asserting sex discrimination as well as race and disability discrimination, and which had afforded Alliant the opportunity to amend its motion for summary judgment to address all of Fuller's claims. *See* Plaintiff's Resistance To Defendant's Motion For Extension To File Reply Pleadings In Support Of Summary Judgment (docket no. 88). The court overruled those objections by order dated July 21, 2006 (docket no. 90).

4

Neither party requested oral arguments on Alliant's amended motion for summary judgment. Therefore, that motion is now fully submitted.

## B. Factual Background

### 1. The pertinent record

The court's determination of what facts are actually disputed at the summary judgment stage of these proceedings has been hampered by Fuller's failure to file a response to Alliant's statement of facts as required by the applicable local rule. Local rule 56.1(b) provides, in pertinent part, as follows:

> **b.** **Resisting Party's Documents**. A party resisting a motion for summary judgment must, within 21 days after service of the motion, file contemporaneously all of the following:
>
>     \* \* \*
>
> **2.** A response to the [moving party's] statement of material facts in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact, filed as an electronic attachment to the brief under the same docket entry;
>
> **3.** A statement of additional material facts that the resisting party contends preclude summary judgment, filed as an electronic attachment to the brief under the same docket entry[.]

N.D. Iᴀ. L.R. 56.1(b)(2). Instead of filing *both* the required response to Alliant's statement of material facts pursuant to N.D. Iᴀ. L.R. 56.1(b)(2) *and* a statement of additional facts pursuant to N.D. Iᴀ. L.R. 56.1(b)(3), Fuller filed only an Amended Statement Of Undisputed Facts In Support Of Plaintiff's Resistance To Summary Judgment, which is apparently intended to comply with N.D. Iᴀ. L.R. 56.1(b)(3).

The local rule provides, further, as follows:

> A response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record. *The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact.*

N.D. IA. L.R. 56.1(b) (unnumbered paragraph) (emphasis added). Because Fuller failed to file a response to Alliant's Statement Of Facts as required by N.D. IA. L.R. 56.1(b)(2), the court could treat all of the facts set forth in Alliant's Statement Of Facts as admitted. The court has done just that quite recently in another case in which a responding party failed to comply with N.D. IA. L.R. 56.1(b)(2). *See Saeemodarae v. Mercy Health Serves—Iowa Corp.*, ___ F. Supp. 2d ___, 2006 WL 2848612, *3-*4 (N.D. Iowa Oct. 5, 2006). In that case, the court deemed admitted all facts set forth in a statement of facts to which no proper response had been filed after the court had expressly advised the parties that compliance with N.D. IA. L.R. 56.1 was required for their submissions in support of or resistance to a motion for summary judgment filed after the court had "converted" a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure into a motion for summary judgment. *Id.* The court does not believe that such an express reminder to comply with the applicable local rules should be required in all cases, or even in cases in which a party is litigating *pro se*. Nevertheless, to provide the *pro se* plaintiff in this case with the fullest opportunity to be heard in response to the defendant's motion for summary judgment, the court will deem admitted only those facts set forth in the defendant's statement of facts to which the court can find no contrary statement in the plaintiff's Amended Statement Of Undisputed Facts.

Even with that caveat, the court will not attempt a dissertation of undisputed and disputed facts. Rather, the court will provide here only a statement of sufficient of the facts, undisputed and disputed, to put in context the parties' arguments for and against Alliant's motion for summary judgment. In this case, the court finds it more useful to organize the facts by topics rather than to separate them, somewhat artificially, into "undisputed" and "disputed" facts. Thus, unless otherwise noted, the facts stated are undisputed.

### 2.    *Background to Fuller's employment*

Alliant hired Fuller, who is African-American, in June of 2000. Fuller was hired as a Customer Service Consultant, but her job title was later changed to Customer Service Coordinator II (CSC). Whatever her position was called, Fuller's job was to be responsible for serving as a knowledgeable, responsive point of contact for customers of Alliant's parent company and other subsidiaries of the parent company. Alliant is, itself, a subsidiary of Alliant Energy Corporation, and its purpose is to provide administrative support functions, such as customer service, human resources, communications, environmental, safety, and information technology to other subsidiaries of Alliant Energy Corporation.

Fuller worked at Alliant's call center in Cedar Rapids, Iowa. As of January 2003, the customer service center in which Fuller worked had 50 female and 13 male employees. Alliant asserts that there are no records of any promotions involving any of those employees in 2002, and that two women, but no men, were promoted into positions in the service center. Fuller contends that she was the only CSC with a masters degree, but Alliant contends that fact, if true, is irrelevant, because a masters degree was not required for Fuller's position. Fuller asserts that she was one of only two African-American females working at the Cedar Rapids call center and that one African-American male was

hired during her tenure, for publicity purposes, but then harassed until he was forced to resign. Alliant denies that the African-American male in question was forced to resign, contending, instead, that he voluntarily resigned. Fuller also contends that she was the only CSC with nineteen years of Human Resources experience, but was never considered for any of the ten Human Resources positions for which she applied. Alliant admits that Fuller was not interviewed for any Human Resources position, but denies that Fuller had nineteen years of Human Resources experience or that she applied for as many as ten Human Resources positions.

Fuller contends that her performance evaluations were above average and that she was often rewarded for good work, while Alliant contends that this information is irrelevant, because Fuller was properly disciplined for violations of Alliant's policies and ultimately quit her job voluntarily.

### 3. *Absenteeism*

Alliant's employees are eligible for several types of leaves of absence, including paid bereavement leave, sick leave, vacation, personal time off, and unpaid leave under the Family and Medical Leave Act (FMLA). The bereavement leave policy, which is the policy most at issue here, provides, in pertinent part, as follows:

### 3. Family Member/Time Allowed

A. Bereavement Leave of up to five days, without loss of regular pay, is provided to allow an employee a reasonable time to make necessary arrangements and attend the funeral of a family member as follows:

- Your spouse, domestic partner, child or stepchild.

- Your father or mother, stepfather or stepmother or your legal guardian.
- Your spouse's father or mother, stepfather or stepmother or legal guardian.

* * *

### 5. Administration

Employees are responsible for notifying their supervisor as soon as possible that they will need time off from work because of a death in their family. The employee's supervisor may allow additional non-paid time off work if the situation so warrants. The company reserves the right to require proof of death and/or relationship.

Defendant's Appendix (docket no. 72), 19-20.[2]

Fuller's work history includes numerous absences for various reasons. Fuller missed work on June 14, 15, and 18, 2001, without notifying her supervisor that she would be absent or obtaining prior approval. Co-workers informed Chris Burr, Fuller's supervisor at the time, that they understood that Fuller was visiting her sister in California. On June 22, 2001, Burr issued Fuller a written warning concerning this absence, then met with Fuller to discuss the warning.

Fuller had a series of absences for bereavement leave in 2002 and 2003: April 24-26, and 29-30, 2002, owing to a death in the family, but Fuller's relationship to the deceased was not recorded; August 1-5, 2002, which included a weekend, owing to the

---

[2]Alliant relies on the Appendix filed with its original motion for summary judgment (docket no. 72) as well as a Supplemental Appendix filed with its amended motion for summary judgment (docket no. 80).

death of her grandfather; January 9-15, 2003, which also included a weekend and occurred just prior to a previously scheduled and approved vacation on January 16-17, 2003, owing to the death of her stepmother; May 5-7, 2003, owing to the death of her grandmother; and June 9-11, 2003, owing to the death of her brother-in-law. Alliant did not require proof of death or relationship for any of these bereavement leaves. In addition, Fuller had exhausted her paid vacation and personal holidays for 2003 by May 27, 2003. Because Fuller had no paid vacation or personal time left, Fuller was allowed to take unpaid time off on August 7-8, 2003, after Fuller informed her supervisor, Cindy Armstrong, that she needed to appear as the plaintiff in a lawsuit in Kansas.

On or about July 30, 2003, Fuller advised Armstrong that she needed the next day off to attend the funeral of her mother-in-law. Although Armstrong was not aware that Fuller was married, she approved Fuller's request for bereavement leave. However, Fuller did not return to work as expected on Friday, August 1, 2003, nor did she call to notify Armstrong that she would be absent. Fuller also did not appear for work the entire following week, August 4-8, 2003, which included the two days for which Fuller had previously obtained permission for unpaid leave to appear in a lawsuit in Kansas. When Fuller returned to work on August 11, 2003, she responded to Armstrong's query about her failure to report by explaining that she thought she had five days off for the death of her mother-in-law. Fuller contends that she had no reason to specify the number of days that she would be taking for bereavement leave, because Alliant's policy specified the number of days allotted for each relative. Armstrong told Fuller that bereavement leave for a mother-in-law was *up to* five days, but that the full period was not automatic. Fuller explained that her long absence had resulted from her car breaking down on the way to her mother-in-law's wake and that the car had not been repaired in time for her to return to work before her previously scheduled, unpaid time off.

10

Armstrong found Fuller's use of bereavement leave and other absences in 2002 and 2003 sufficiently suspicious that she consulted the Human Resources Department. After doing so, Armstrong advised Fuller that she would be required to provide proof of death and relationship in order to obtain approval for the August 2003 bereavement leave for her mother-in-law's death. On August 12, 2003, Fuller provided a program from the funeral of Thelma Louise Williams Carter in Gary, Indiana, on August 1, 2003, but the program did not list Fuller among Mrs. Carter's surviving children and children-in-law. Defendant's Appendix at 98-99. Armstrong found this documentation insufficient and sent Fuller home, without pay, with instructions to return on August 13, 2003, with additional documentation. *Id.* at 100. Fuller contends that Armstrong was "irate" when Fuller demanded that she put in writing the reasons that she was sending Fuller home without pay, because Fuller believes that Armstrong was trying to "set her up" for discharge for walking off the job. Alliant disputes the contention that Armstrong was "irate" or that she had a hidden purpose. On August 13, 2003, Fuller returned to work with a marriage certificate indicating that she was married to Calvin Carter, Jr., on April 6, 2002, but the marriage certificate identified Calvin Carter's mother as Hattie Mae Jackson, not Thelma Louise Williams Carter. *Id.* at 101. Nevertheless, because the funeral program for Mrs. Carter identified Calvin Carter, Jr., as a surviving son, Armstrong approved Fuller's August 2003 bereavement leave.

Fuller had seven unscheduled absences from June 2003 through December 2003, for some of which she used sick leave, and for one of which she took unpaid leave to attend legal proceedings. On October 16, 2003, Armstrong had a meeting with Fuller to counsel her about excessive absenteeism. During that meeting, she advised Fuller about FMLA leave that might be available to Fuller, if she was unable to work owing to a serious health condition. Fuller contends that she was the only employee ever accused of

taking excessive bereavement leave after notifying her supervisor of the need for such leave. She also contends that all of her leave through August 2003 had been approved by management, so that it should not have been considered "excessive."

On October 23, 2003, Fuller submitted a request for retroactive counting of an absence on September 29-30, 2003, as FMLA leave. *Id.* at 102. Fuller eventually submitted a health certification provided by Fuller's physician, Dr. Zabner, to Intracorp, Alliant's third-party medical review company, in support of Fuller's FMLA leave request. That certification stated that Fuller was a "chronic asthmatic," but described her as having "mild asthma," which if "well control[led]" would "usually result[ ] in minimal days of[f] work," although Dr. Zabner also stated that "if she needs to be admitted to the hospital it i[s] usually a 2 week convalescence." Defendant's Appendix at 103-04. Dr. Zabner also checked "no" in response to each of the following questions: "a. If medical leave is required for the employee's absence from work because of the employee's own condition (including absence due to pregnancy or a chronic condition), is the employee unable to perform work of any kind?"; "b. If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job (the employee or the employer should supply you with information about the essential job functions)?"; and "c. If neither a. nor b. applies, is it necessary for the employee to be absent from work for treatment?" Notes from a follow-up telephone conversation between Dr. Zabner and a representative of Intracorp indicate that Dr. Zabner confirmed that Fuller's mild asthma was not a condition that qualified for FMLA leave. *Id.* at 105. On the basis of the information received from Dr. Zabner, Alliant denied Fuller's request for FMLA leave for the September 29-30, 2003, absence. *Id.* at 106. After two more two-day absences due to illness on October 30-31, 2003, and December 15-16, 2003, Armstrong issued Fuller a written warning on December 22, 2003, for excessive absenteeism, which noted that

"[c]ontinued failure to meet attendance expectations will result in further disciplinary action up to and including termination of employment." *Id.* at 107.

In 2004, Fuller had an unscheduled absence owing to illness on March 8-9, 2004. After that absence, Armstrong met with Fuller on March 16, 2004, to counsel Fuller again about the importance of attendance and avoiding further absences. Nevertheless, on April 26, 2004, Fuller called in prior to the start of her shift and informed Chris Burr, the designated shift supervisor, that her father-in-law had passed away and that she needed to travel to Louisiana for the funeral. Fuller asked for bereavement leave for the entire week of April 26-30, 2004. Burr advised Fuller that, because of prior attendance issues, she would need to provide documentation to support her request for paid leave. When Burr advised Armstrong that Fuller was requesting bereavement leave for the death of her father-in-law, Armstrong recalled that the information from her mother-in-law's funeral the prior August indicated that her husband's father, Calvin Carter, Sr., was already deceased.

On Monday, May 23, 2004, the day Fuller was expected to return to work, she called before the start of her shift and again spoke to Burr. She explained that her husband had become ill on the way back from the funeral and had been hospitalized, and that she had to fly to Mississippi to be with him. Burr advised Fuller that he would arrange for FMLA paperwork for this absence to be sent to her. Fuller indicated that she would call back the following Monday. Fuller did, indeed, call in again on May 10, 2006, before the start of her shift, but this time she spoke with Kathy Smith, the designated supervisor. Fuller advised Smith that her husband was still unwell, that she needed to stay with him in Louisiana, and that she did not know when she would return to work or when she would be able to complete the FMLA paperwork. Later that day, after Smith reported Fuller's call to Armstrong and Ann Jubeck, the Customer Service Center Manager, Armstrong and

Jubeck called Fuller on her cell phone and told her to complete whatever FMLA paperwork she could and to fax it back to them. They also reiterated a request for documentation to support the request for bereavement leave for the immediately preceding absence.

On May 12, 2004, Fuller faxed a copy of a newspaper obituary to Armstrong to document the bereavement leave, but the fax originated from a 775 area code, which is in Nevada, while the newspaper obituary indicated that Jack Tucker Yates had died on April 25, 2004, and that his funeral had been April 28, 2004, in Nashville, Tennessee, not Louisiana or Mississippi, as Fuller had indicated, or Nevada, as the fax area code indicated. Defendant's Appendix at 109. Fuller contends that she faxed the document from Kansas City, not Nevada. The obituary also did not mention either Fuller, Calvin Carter, Jr., Thelma Louise Williams Carter, or Hattie Mae Jackson among relatives of Mr. Yates, living or dead. Therefore, on May 14, 2004, Jubeck sent Fuller a letter stating that the obituary was not adequate documentation to support her request for bereavement leave and that additional documentation establishing a relationship between Fuller and Mr. Yates would be required before leave could be approved. *Id.* at 110. Fuller contends that Jubeck rescinded authorization for bereavement pay that had already been included in one of her pay checks. Alliant contends that the bereavement leave was only entered on Fuller's time sheet, but was thereafter reversed when she failed to produce adequate documentation.

Fuller responded to Jubeck's May 14, 2004, letter on May 24, 2004, by calling Fuller to explain that Mr. Yates was her husband's stepfather and to ask what further documentation of the relationship would be required. Jubeck explained that the documentation would need to show that Mr. Yates was her husband's stepfather, but that the form of the documentation was up to Fuller. Fuller never provided any further

14

documentation of her relationship to Mr. Yates. However, Fuller contends that Jubeck failed to realize that obituaries do not always include all pertinent information, and that Jubeck's mission was to find inconsistencies in the information that Fuller provided, so that Jubeck could deny Fuller's request for bereavement leave. Fuller also asserts that obtaining the documentation that Jubeck required was an almost impossible task. Alliant denies these allegations.

On May 18, 2004, Fuller also faxed Alliant a health care certification indicating that she needed FMLA leave owing to her husband's serious health condition, which was described as an "abdominal obstruction with inability to retain food consumed due to treatments for cancer." This fax also originated from the 775 area code, which is in Nevada. Although the certification form was purportedly signed by a Dr. Kulkarni in Kansas City, Missouri, the doctor's portion of the form appeared to be in the same handwriting as the section completed and signed by Fuller. Defendant's Appendix at 111. Suspicious of the circumstances and documents on which this FMLA leave request was based, Alliant contacted Intracorp to request that Intracorp contact the health care provider who had purportedly signed the certification to determine the authenticity of the certification. When an Intracorp representative contacted Dr. Kulkarni, the representative learned that Dr. Kulkarni was an emergency room physician at a Veterans Administration hospital in Kansas City, that she had seen Mr. Carter in the emergency room, but had learned that it was against hospital policy to fill out FMLA forms, so she had only given Fuller a note to show that she was in the emergency room with her husband. Dr. Kulkarni also explained that she was not Mr. Carter's regular treating physician. Defendant's Appendix at 113 (notes of telephone call with Dr. Kulkarni). Based on this information, Alliant sent Fuller a letter notifying her that her request for FMLA leave was denied for lack of a valid certification. Defendant's Appendix at 114. Fuller contends that Intracorp

15

could have obtained a certification concerning her husband's condition from doctors at the University of Iowa Hospitals and Clinics (UIHC) or the Veterans Hospital in Iowa City, but made no effort to do so, probably on Jubeck's instructions. Alliant points out that Fuller submitted the falsified health care certification purportedly by Dr. Kulkarni, and that Alliant did not have access to information about other doctors who were treating Fuller's husband.

Also, on May 26, 2004, Alliant sent Fuller a letter advising her that, because Alliant had not received sufficient information or documentation to approve her absence from work since April 26, 2004, she was expected to return to work immediately. The letter continued, "Your failure to return to work by June 2, 2004 will be deemed as your voluntary resignation from employment with Alliant Energy." *Id.* at 27. Fuller never returned to work after the May 26, 2004, notice was sent.

### 4. *Harassment and disparate treatment*

While Alliant has focused on the reasons for Fuller's termination, Fuller contends that she was also harassed and subjected to different treatment than white or male employees. She contends that she was the only CSC required to e-mail Armstrong if she signed in more than three minutes late, while two other white employees, whom she identifies as Marcum and Storks, were not required to e-mail Armstrong unless they were ten minutes late. Fuller contends that she worked the 2:00 p.m. to 10:00 p.m. shift, so that she had to wait for persons on the previous shift to sign off their computers before she could sign in, which often delayed her sign-in time by more than three minutes. Alliant denies this allegation, asserting that all CSCs were required to e-mail Armstrong if they signed in late. Fuller also contends that the various counseling she received for absenteeism was intended as a "scare tactic" to harass her. Alliant responds that there is

no evidence that Alliant's attendance policy was directed just at Fuller or was used for unlawful discrimination based on Fuller's race or sex.

Fuller also contends that Armstrong tapped into her work phone to make sure that Fuller was not making personal calls, while white employees were allowed to place and receive calls daily on the business phones as well as on their personal cell phones, even in Armstrong's presence. Fuller also contends that Armstrong deducted performance points from Fuller for one personal call. Alliant denies that Armstrong or any other supervisor treated Fuller differently than other employees with respect to personal calls, and points out that one of Armstrong's responsibilities as a supervisor was to monitor and critique calls by employees and that, when properly doing so, she discovered Fuller engaged in a personal call.

Fuller also contends that she was harassed and threatened by Chris Burr about her FMLA leave and that Burr called her daily about returning to work before her doctor had released her. Again, Alliant denies that any such harassment occurred. Fuller also contends that Burr constantly intimidated and harassed her in the hope that she would resign, and gave Fuller negative recommendations, which prevented her from getting interviewed for positions in Human Resources. Fuller contends that Burr resented her, because she had more formal education than he did and didn't look like the people Burr was used to working with. Fuller contends, further, that Burr was a known racist, who was bitter that he was passed over for promotion despite many years of employment with Alliant. Alliant denies all such characterizations of Burr and contends that Burr does not even recall any inquiries by other managers about Fuller. Fuller also contends that Burr placed her on a Disciplinary Plan for one-and-one-half years and conspired with J.R. Welter, the Human Resources Manager, to do so to prevent Fuller from advancing into a Human Resources position, all of which Alliant denies.

Fuller also contends that she was subjected to loud conversations riddled with racial slurs by a co-worker, Nicole Sharp, whose work station was across the aisle from Fuller's. Although Fuller asserts that she reported this racist conduct to Burr, as did other employees, Burr not only did nothing, but excused Sharp's use of profanity as a way to release stress. Alliant states that Burr recalls complaints about Sharp's use of profanity and being loud and obnoxious, but does not recall allegations that Sharp used racial slurs. Moreover, Alliant contends that the fact that other employees complained about Sharp's behavior makes clear that her behavior was not directed at Fuller.

Fuller contends that she suffered constipation and other bowel problems as a result of the hostile work environment to which she was subjected by Alliant, but Alliant points out that Fuller's own medical exhibits demonstrate that she had suffered from problems with constipation for twenty years. Similarly, while Fuller attributes her need for treatment for depression to the conduct of Alliant, Alliant points out that Fuller's submissions show that Fuller attributed her depression to her "many life problems," including the death of her father-in-law and her husband's and sister's illnesses, and that Fuller did not mention her work situation as one of those problems until she received the denial of her FMLA request in May 2004. Even then, Alliant asserts that Fuller attributed the stress to driving to Cedar Rapids every day from Kansas City.

Fuller also contends that she was the only person who knew if her asthma made her too ill to work and that Alliant's sick leave policy discriminates against CSCs, because sick days were given as a benefit, but were actually treated as discretionary. Fuller also contends that other employees were allowed to use sick days without consequences, while she was subjected to unjustified counseling and discipline for using sick days. Alliant responds that all employees were subject to the same sick leave policy. While Fuller asserts that Alliant supervisory or managerial employees, including Jubeck and Armstrong,

were intent upon finding inconsistencies in her requests for bereavement leave, Alliant contends that managerial employees were entitled to ensure that the company's bereavement leave was not being abused and that those employees properly requested documentation in support of Fuller's leave requests as specified under the bereavement leave policy.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. *Fed. R. Civ. P.* 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005); *Steck v. Francis*, 365 F. Supp. 2d 951, 959-60 (N.D. Iowa 2005); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 984 (N.D. Iowa 2004); *Nelson v. Long Lines Ltd.*, 335 F. Supp. 2d 944, 954 (N.D. Iowa 2004); *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 988 (N.D. Iowa 2004); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of

all reasonable inferences that can be drawn from the facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377. Furthermore, "where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (quoting *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1405-06 (8th Cir. 1990)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993).  When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995).  An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus.*, 475 U.S. at 586-87).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," i.e., are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394.  If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party

is "entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment discrimination cases." *See Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994). This exceptional deference shown the nonmoving party is warranted, according to the Eighth Circuit Court of Appeals, "[b]ecause discrimination cases often turn on inferences rather than on direct evidence . . . . ," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and because "intent" is generally a central issue in employment discrimination cases. *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)). Nonetheless, this exercise of judicial prudence "cannot and should not be construed to exempt" from summary judgment, employment discrimination cases involving intent. *Christopher*, 137 F.3d at 1071 (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995)). The fact remains that "the ultimate burden of persuading the trier of fact that the defendants intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). The court will apply these standards to the defendant's Motion for Summary Judgment.

However, the court must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying those principles

to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard incantation of summary judgment principles is the role of experience. Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881). Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination and retaliation, except in the rarest cases, is difficult to prove. It is perhaps more difficult to prove today—more than forty years after the passage of Title VII and more than fifteen years after the passage of the ADA, both of which are at issue here—than during Title VII's earlier evolution. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination are proportional to the caliber of the employee, discrimination against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.*

Consequently, with both the legal standards for summary judgment and the teachings of experience in hand, the court turns to consideration of the parties' arguments for and against summary judgment on each of Fuller's claims. As construed by the court, Fuller's complaint asserts three separate claims: race *and* sex discrimination, in violation of Title VII, and disability discrimination, in violation of the ADA. Alliant has amended its summary judgment motion to seek summary judgment on all three of Fuller's claims. Before considering each of Fuller's claims, in turn, however, the court must first consider to what extent Fuller exhausted her administrative remedies on her claims in order to assert them in judicial proceedings.

## B. Failure To Exhaust Administrative Remedies

### 1. Arguments of the parties

To the extent that Fuller's claims are based on alleged failure to promote her for discriminatory reasons, Alliant contends that Fuller failed to exhaust her administrative remedies. Alliant contends that, even giving Fuller liberal consideration as a *pro se* plaintiff, Fuller never included in her administrative charge any notice that her claims of discrimination were based on failure to promote her for discriminatory reasons. Alliant notes that Fuller identified various fact-specific incidents in her administrative charge, but none of those instances involved or implied discriminatory failure to promote her. Thus, Alliant contends, because failure-to-promote claims could not be reasonably inferred by the administrative agency from Fuller's administrative charge, Fuller failed to exhaust administrative procedures as to any such claims. In the absence of such exhaustion of administrative remedies, Alliant contends that it is entitled to summary judgment on any parts of Fuller's claims that are premised on allegedly discriminatory failure to promote.

In response, Fuller argues only that she can establish the elements of a failure-to-promote claim.

### 2. Analysis

As the Eighth Circuit Court of Appeals has explained,

> Exhaustion of administrative remedies is central to Title VII's statutory scheme because it provides the EEOC the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts. To exhaust administrative remedies an individual must: (1) timely file a charge of discrimination with the EEOC setting forth the facts and nature of the charge and (2) receive notice of the right to sue.

*Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994) (internal citation omitted). Because administrative charges are often drafted *pro se*, and administrative procedures should not be "a trap for the unwary," administrative charges should be construed "charitably" or "liberally." *Duncan v. Delta Consol. Indus., Inc.*, 371 F.3d 1020, 1025 (8th Cir. 2004). Moreover, the subsequently-filed lawsuit does not have to "mirror" exactly the administrative charges, but "'the sweep of any subsequent judicial complaint may be [only] as broad as the scope of the EEOC "investigation which could reasonably be expected to grow out of the charge of discrimination."'" *Id.* (quoting *Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir. 1988), in turn quoting *Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir. 1985)). Nevertheless, as the Eighth Circuit Court of Appeals has also explained, "Although we will 'liberally construe an administrative charge for exhaustion of remedies purposes, we also recognize that "there is a difference between liberally reading a claim which lacks specificity, and inventing, *ex nihilo*, a claim which simply was not made."'" *Cottrill v. MFA, Inc.*, 443 F.3d 629, 635 (8th Cir. 2006) (quoting *Parisi v. Boeing Co.*, 400 F.3d 583, 585 (8th Cir. 2005), in turn quoting *Shannon*

*v. Ford Motor Co.*, 72 F.3d 678, 685 (8th Cir. 1996)). In addition, more than a mere "reference" to facts suggesting that the plaintiff was complaining about a failure to promote her in her administrative charge is required to exhaust remedies for a failure-to-promote claim, because the "reasonably related" standard requires a closer affinity to allegations of discrimination, in terms of actors and factual circumstances allegedly involved, to "hook" in the failure-to-promote claim. *See Shannon*, 72 F.3d at 685. Allegations outside of the scope of the administrative charge are not allowed in subsequent judicial proceedings. *Duncan*, 371 F.3d at 1025.

In light of these standards, Fuller's argument that she can establish the elements of a failure-to-promote claim misses the point, because it does not address her failure to assert such claims in her administrative charge, *see Cottrill*, 443 F.3d at 635 (liberal construction of an administrative charge does not extend to "inventing, *ex nihilo*, a claim which simply was not made") (citations and internal quotation marks omitted), or suggest that the failure-to-promote claims are, somehow, reasonably related to the claims that she did assert in her administrative charge. *See Duncan*, 371 F.3d at 1025 (the subsequently-filed lawsuit does not have to "mirror" exactly the administrative charges, but the judicial complaint can only be as broad as the scope of the EEOC investigation that could reasonably be expected to grow out of the administrative allegations); *Shannon*, 72 F.3d at 685 (the judicial claims must be "reasonably related" to the administrative claims, or the judicial claims were not properly exhausted). Thus, Fuller has really raised no pertinent argument in response to Alliant's motion for summary judgment on the failure-to-promote claims on the ground that such claims have not been administratively exhausted.

Nevertheless, the court will consider the scope of Fuller's administrative claims, to see if the subsequent judicial claims were administratively exhausted. Fuller identified the

following "particulars" of race, sex, and disability discrimination in her administrative charge of discrimination:

> 1.    I was hired by this Respondent in 2000.  In the past 300 days, I have been subjected to the following discriminatory terms and conditions of employment:  (a) Around August 1, 2003, I was required to bring in proof that my mother-in-law passed away and proof that I was married.  (b) Around November, 2003, I was told to send my supervisor a note if I sign into my computer three minutes or more late; this policy has since changed.  (c) Around December 22, 2003, I was reminded that I could not make personal phone calls, even though I don't make personal calls.  Also on December 22, 2003, I was disciplined in the form of being placed on a Performance Plan, rather than being provided an effective reasonable accommodation.
>
> 2.    I was not given a reason for the above-mentioned terms and conditions of employment.  I was informed I was being placed on a Performance Plan because I took off more than three days in a six-month period.
>
> 3.    I believe that Respondent violated Title VII of the Civil Rights Act of 1964, as amended, on the basis of my race plus gender (Black female) when I was subjected to the above-mentioned discriminatory terms and conditions of employment. I also believe the Respondent violated Title I of the Americans with Disabilities Act of 1990 on the basis of my being a qualified individual with a disability when I was disciplined rather than being provided an effective reasonable accommodation.

Defendant's Appendix (docket no. 72-5), 29.  Not one of the incidents identified in Fuller's administrative charge makes even a "reference" to failure to promote Fuller as a basis for her allegations of discrimination.  Fuller's allegations of discrimination in her administrative charge are "not at all vague"; rather, as in *Shannon*, Fuller "'specifically

and unambiguously alleged'" certain incidents as the basis for her discrimination charge, and administrative exhaustion of her claims did not reasonably reach beyond the scope of her specific allegations. *Shannon*, 72 F.3d at 685 (quoting *Williams*, 21 F.3d at 223). Nor can the court find that Fuller's failure-to-promote claims are "reasonably related" to the allegations in her administrative charge, *see id.*, or that they fall within "'the scope of the EEOC "investigation which could reasonably be expected to grow out of the charge of discrimination."'" *Duncan*, 371 F.3d at 1025 (8th Cir. 2004) (quoting *Cobb*, 850 F.2d at 359, in turn quoting *Griffin*, 755 F.2d at 1522). Therefore, the court agrees with Alliant that Fuller's failure-to-promote claims fall outside the scope of her administrative charge and, as such, should not allowed in these subsequent judicial proceedings. *Id.*

Nevertheless, in an abundance of caution, the court will consider whether Fuller can generate any genuine issues of material fact on the merits of her failure-to-promote claims, as well as her other claims of discriminatory treatment.

### C. Fuller's Sex Discrimination Claim

Fuller's sex discrimination claim, like her race discrimination claim discussed below, is based on her allegations that she was treated differently than "white males." *See* Complaint (docket no. 40, Kansas District Court docket no. 4), 4. As noted above, Fuller has identified the categories of discriminatory action, generally, as termination of employment, failure to promote, unequal terms and conditions of employment, reduction in wages, and retaliation. *Id.* at 3. The only specific reference to sex discrimination in her Complaint, however, is the following:

> White males were allowed to violate set policies while everything I d[id] was examined constantly. I applied for various promotions but since my supervisor had written

> negative information in my file I was never considered for a
> promotion. The information was false and prejudicial. . . .

*See* Complaint (docket no. 40, Kansas District Court docket no. 4), 4, ¶ 11.

### 1.    *Arguments of the parties*

In support of its motion for summary judgment on this claim, Alliant contends that Fuller cannot generate a *prima facie* case of sex discrimination, because she cannot show that she was qualified for her position or a promotion to another position or that any similarly situated male was treated differently or promoted instead. More specifically, Alliant contends that Fuller has no evidence that any similarly situated males, *i.e.*, males with comparable absenteeism or use of bereavement leave, were treated differently. Alliant also argues that Fuller's failure to receive promotions had nothing to do with her sex, because six of the positions she has identified were filled by women, two were withdrawn before they were filled, and only two were filled by men, and those men were better qualified than Fuller. Alliant also contends that Fuller quit her job voluntarily by failing to provide required documentation to support her extended leave in April and May of 2004. Thus, Alliant argues that Fuller simply cannot show that any adverse action she suffered was because of her sex.

Alliant also argues that it has identified legitimate, non-discriminatory reasons for actions taken towards Fuller, including Fuller's poor attendance and lesser qualifications than persons chosen to fill various positions to which she asserts that she should have been promoted. Alliant also argues that its request for documentation and verification of Fuller's use of bereavement and other leave was fully justified by the circumstances and the applicable policies.

Finally, Alliant contends that there is absolutely no evidence of pretext in its decisions or evidence that Fuller's sex was the true reason for her treatment. Specifically,

Alliant contends that there is simply no evidence that the reasons given for its action are false.

In response, Fuller argues that males (and still more specifically, Caucasian males) were allowed to call in ill on the same days each week without being disciplined, to sign in on their computers late without consequences, to use the business phones for their personal use, to speak to customers and supervisors in an unprofessional manner, and to take breaks whenever they wanted. She also contends that Alliant's proffered justification is not legitimate, because Alliant could have utilized the disciplinary plan to punish her if Alliant had had a legitimate reason to terminate her, but did not do so. Moreover, she argues that there is evidence of a conspiracy to prevent her, a woman with nineteen years of Human Resources experience, above average evaluations, and a master's degree, from obtaining a promotion to a Human Resources position.

In reply, Alliant argues that Fuller has generated only denials and conclusory allegations, but no evidence sufficient to generate genuine issues of material fact on her sex discrimination claim. More specifically, Alliant argues that Fuller has not pointed to any evidence demonstrating that any of the adverse actions upon which she relies to support this claim were actually based on a sex-discriminatory animus, rather than her attendance problems or lesser qualifications.

### 2. Sufficiency of Fuller's prima facie case

To establish a *prima facie* case of disparate treatment based on sex, a plaintiff must show the following: (1) she was a member of a protected group; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) she was treated differently from similarly situated males. *Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 910 (8th Cir. 2006); *Turner v. Gonzalez*, 421 F.3d 688, 694 (8th Cir. 2005). The fourth element can also be met "if the employee provides 'some other evidence that would give

rise to an inference of unlawful discrimination.'" *Turner*, 421 F.3d at 694 (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003)). Similarly, to establish a *prima facie* case of discriminatory failure to promote, the plaintiff must show the following: (1) she was a member of a protected group; (2) she was qualified and applied for a promotion to an available position; (3) she was rejected; and (4) a similarly-situated candidate, not part of the protected group, was hired for the position instead. *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005) (race discrimination based on failure to promote).[3] Alliant specifically disputes Fuller's ability to generate genuine issues of material fact on the second and fourth elements of her *prima facie* case of disparate treatment or failure to promote based on sex.

### a. *Qualification*

The parties dispute whether Fuller was "qualified" for her position or for promotion to a new position, as required by the second element of her *prima facie* case. *See Tenge*, 446 F.3d at 910; *Pope*, 406 F.3d at 1007. The Eighth Circuit Court of Appeals recently explained the "qualification" element of the plaintiff's *prima facie* case of sex discrimination as follows:

---

[3]To establish a *prima facie* failure-to-promote claim, a plaintiff must ordinarily show that she applied for the promotion and was rejected, *McClure v. Career Sys. Dev. Corp.*, 447 F.3d 1133, 1135 (8th Cir. 2006) (citing *Lockridge v. Board of Trustees of Univ. of Ark.*, 315 F.3d 1005, 1010 (8th Cir. 2003)), but a plaintiff may establish a *prima facie* case even without an application for the position, if the employer's discriminatory practices make application futile. *Id.* at 1136 (citing *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 367-68 (1977)). Fuller contends that she applied for at least ten positions in Human Resources, and while Alliant disputes the number of positions for which Fuller applies, Alliant does not dispute that Fuller applied for some positions. Thus, this requirement is met as to Fuller's claim of a racially discriminatory failure to promote her.

> At the prima facie stage of a sex discrimination case, the employee must demonstrate objective qualifications. *Legrand v. Trustees of University of Arkansas at Pine Bluff*, 821 F.2d 478, 481 (8th Cir. 1987). An employee must show that her qualifications are equivalent to the minimum objective criteria. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003). The threshold criteria are the plaintiff's physical ability, education, experience in the relevant industry, and the required general skills. *Whitley v. Peer Review Systems, Inc.*, 221 F.3d 1053, 1055 (8th Cir. 2000) (physical ability); *Wexler*, 317 F.3d at 576 (education, experience, and general skills). These qualifications are demonstrated when the employee "actually performs her job at a level that [meets her] employer's legitimate expectations." *Whitley*, 221 F.3d at 1055; *see also Miller v. Citizens Sec. Group*, 116 F.3d 343, 346 (8th Cir. 1997).

*Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1046-47 (8th Cir. 2005). Here, Fuller cannot generate a genuine issue of material fact on this element of her *prima facie* case, as to either termination, disparate treatment in other terms and conditions, or failure to obtain promotions, because her absenteeism problems and frequent counseling for those problems demonstrate that she was not actually performing her job at a level that met her employer's legitimate expectations. *See id.* (stating the "legitimate expectation" standard for "qualification"); *see also Greer v. Emerson Elec. Co.*, 185 F.3d 917, 921 (8th Cir. 1999) (in an ADA case, finding that the plaintiff was not "qualified" because of her excessive absences, because "'regular and reliable attendance is a necessary element of most jobs'") (quoting *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 198 (4th Cir. 1997). Therefore, Fuller has failed to generate genuine issues of material fact on the "qualification" element of her *prima facie* case of disparate treatment or failure-to-promote sex discrimination.

### b.    *Different treatment*

To establish the fourth element of her *prima facie* case of sex discrimination, Fuller must show that she was treated differently from similarly situated males, *Tenge*, 446 F.3d at 910, or that a similarly situated male was chosen for the promotion she sought. *Pope*, 406 F.3d at 1007. As to Fuller's claim of disparate discipline, she must show that she and male co-workers "were 'involved in or accused of the same or similar conduct and [were] disciplined in different ways.'" *Id.* (quoting *Rodgers v. U.S. Bank, NA*, 417 F.3d 845, 852 (8th Cir. 2005)); *Turner*, 421 F.3d at 695. Here, however, Fuller has not identified *any* males who had comparable absenteeism problems or frequency of use of bereavement leave, but were treated differently. Even if Fuller could identify one instance in which a male employee was not disciplined for taking bereavement leave, such evidence would not be similar to the pattern of misuse of bereavement and other leave that Alliant has identified as one basis for its adverse treatment of Fuller. *See Turner*, 421 F.3d at 695 (isolated incidents of mistakes by male co-workers were not similar to the plaintiff's pattern of ignoring internal workplace responsibilities and deadlines that led to a negative performance review, so that the male co-workers were not similarly situated to the plaintiff). Nor has Fuller offered anything but conclusory assertions that males were allowed to take personal calls, while she was disciplined for one instance when she was on a personal call when Armstrong monitored her line. Fuller, likewise, has made only conclusory allegations that the two men who were chosen over her to fill vacant positions were less qualified than she was.[4] Such conclusory allegations do not meet the obligation of a party opposing summary judgment to go beyond the pleadings, and by affidavits, or

---

[4] Fuller cannot show that similarly situated males filled eight of the ten positions to which she claims that she should have been promoted, because those positions were either filled by women or withdrawn.

by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka*, 122 F.3d at 562; *McLaughlin*, 50 F.3d at 511; *Beyerbach*, 49 F.3d at 1325. Finally, Fuller has pointed to no other evidence that would give rise to an inference of unlawful discrimination to fulfill this element of her *prima facie* case of sex discrimination. *See Turner*, 421 F.3d at 694 (the fourth element can also be met "if the employee provides 'some other evidence that would give rise to an inference of unlawful discrimination'") (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003)). Therefore, the court concludes that Alliant is entitled to summary judgment on Fuller's sex discrimination claim, because Fuller has not generated genuine issues of material fact on the "different treatment" element of her *prima facie* case.

### 3.      *Pretext and inferences of discrimination*

If a plaintiff can make out a *prima facie* case of sex discrimination, the employer must then articulate a legitimate, non-discriminatory reason for its actions, and in response, the employee must demonstrate that the reason was simply a pretext for discrimination. *Tenge*, 446 F.3d at 910; *Turner*, 421 F.3d at 694. Even assuming, for the sake of argument, that Fuller can generate a genuine issue of material fact on the adequacy of her *prima facie* case of sex discrimination, the court finds that she cannot generate any genuine issues of material fact on the further requirements to prove her claim.

First, the court finds that Alliant has, as a matter of law, proffered the necessary legitimate, non-discriminatory reasons for adverse employment actions, including failure to promote Fuller, by pointing to her absenteeism problems, her failure to provide adequate documentation to support requested leave (including submission of a FMLA certification on which a doctor's signature had been forged), the superior qualifications of other employees selected to fill vacant positions, and Armstrong's discovery that Fuller

was actually engaged in a private telephone conversation when Armstrong properly monitored her work phone. *Id.* (the employer must articulate a legitimate, non-discriminatory reason for its actions); *see also Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1037 (8th Cir. 2005) (holding that termination for excessive absences constituted a legitimate, non-discriminatory reason for adverse action). Thus, the question is whether Fuller can establish or generate genuine issues of material fact that Alliant's proffered reasons are pretexts for sexual discrimination.

One way to show pretext is with evidence that other similarly situated individuals who were not in the plaintiff's protected class engaged in the same conduct or conduct of comparable seriousness, but were treated differently. *Russell v. City of Kansas City, Missouri*, 414 F.3d 863, 868 (8th Cir. 2005). Similarly, evidence that the employer promoted a substantially less qualified person who was not in the protected class can support an inference of pretext. *Peterson v. Scott County*, 406 F.3d 515, 523 (8th Cir. 2005). However, the court noted above that Fuller had identified no such evidence. Furthermore, "mere contentions" that supervisory employees "connived" to set up an employee for discharge or other adverse action are not sufficient to establish pretext or discriminatory animus, when the employee presents no evidence to support the contentions. *Al-Zubaidy*, 406 F.3d at 1037. That is precisely the circumstance here, because Fuller relies on nothing more than her opinion and speculation that Jubeck and others conspired to discharger her.

Therefore, Fuller's sex discrimination claim also fails, as a matter of law, because Fuller cannot generate genuine issues of material fact on either pretext or sex-discriminatory animus for adverse employment actions against her.[5]

### D. Fuller's Race Discrimination Claim

Like her sex discrimination claim, Fuller's race discrimination claim is based on her allegations that she was treated differently than "white males." *See* Complaint (docket no. 40, Kansas District Court docket no. 4), 4. As noted above, Fuller has identified the categories of discriminatory action, generally, as termination of employment, failure to promote, unequal terms and conditions of employment, reduction in wages, and retaliation. *Id.* at 3. Fuller alleges race discrimination somewhat more specifically in two respects. First, Fuller alleges the following:

---

[5]To the extent that Fuller's Complaint could be construed to assert hostile environment sexual harassment, the court also finds that Fuller has failed to generate genuine issues of material fact on all of the elements of a *prima facie* case of hostile environment sexual discrimination. *See Nitsche v. CEO of Osage Valley Elec. Co-op.*, 446 F.3d 841, 845 (8th Cir. 2006) ("To establish a prima facie case of hostile work environment sexual harassment, Nitsche must demonstrate: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) his employer knew or should have known of the harassment and failed to take proper remedial action."). At the very least, Fuller has failed to generate genuine issues of material fact that any alleged harassment was "based on sex," rather than in response to her poor attendance, or that any harassment, if based on sex, was sufficiently "severe or pervasive" to affect a term, condition, or privilege of employment. *See id.* While Fuller is quick to assign sexually-hostile (or racially-hostile) animus to any adverse action against her, she offers nothing but her speculation that such actions were motivated by such an animus, rather than by the legitimate, non-discriminatory reasons asserted by Alliant.

> Constant discrimination on a daily basis. The employer would
> allow Whites to use the business phone for personal use and I
> was disciplined for using the business phone and threatened
> with termination.

*See* Complaint (docket no. 40, Kansas District Court docket no. 4), 3, ¶ 10. Second, as

with her sex discrimination claim, Fuller alleges the following:

> White males were allowed to violate set policies while
> everything I d[id] was examined constantly. I applied for
> various promotions but since my supervisor had written
> negative information in my file I was never considered for a
> promotion. The information was false and prejudicial. . . .

*See id.* at 4, ¶ 11.

### 1. Arguments of the parties

Alliant argues that, just as Fuller could not generate a *prima facie* case of sex

discrimination, she cannot generate a *prima facie* case of race discrimination. Again,

Alliant asserts that Fuller failed to substantiate the reasons for bereavement and other leave

and simply failed to return to work at the end of her employment, so that she did not suffer

any adverse employment action. Moreover, Alliant asserts that Fuller was not qualified

for her job, owing to her excessive absences and falsification of FMLA leave

documentation, and that Fuller has presented no evidence that similarly situated white

employees were treated differently. Even if Fuller can generate genuine issues of material

fact on her *prima facie* case of race discrimination, Alliant argues that she cannot generate

genuine issues of material fact that Alliant's proffered legitimate reasons for adverse

employment actions were a pretext for race discrimination. Alliant points out that nothing

undermines its position that regular attendance at work was required, nor is there any

evidence that asking for reasonable verification of reasons for absences was discriminatory.

In response, Fuller contends that she has sufficient evidence to generate genuine issues of material fact on her *prima facie* case of race discrimination, because she asserts that she had a history of good performance evaluations, and that, while she does not have written evidence of all the Caucasians with performance or attendance problems, Alliant does. Therefore, she asserts that she has generated a *prima facie* case of race discrimination. She also asserts that Alliant's proffered reasons for its actions are not adequate, because discrimination is not a legal response to attendance issues or lack of FMLA certification. She contends that Alliant was not interested in obtaining verification of her FMLA leave, once Dr. Kulkarni refused to sign an FMLA certification, because Alliant was intent upon finding reasons to reject her attempts to verify the reasons for absences. She contends that Alliant could not legitimately punish CSCs who exceeded the number of sick days they were allocated. Fuller also argues that there is "overwhelming" evidence of pretext, because Alliant's demands for documentation were not realistic, in light of the fact that obituaries are not exhaustive statements of familial relations of the deceased. Thus, she argues that Alliant's tactic of demanding further documentation, when such documentation was exceedingly difficult to produce, was clearly a pretext for illegal discrimination.

In reply, Alliant argues that Fuller has produced no evidence that race motivated any adverse decision concerning Fuller. Instead, Alliant asserts that the record shows that Fuller had substantial absenteeism problems and was less qualified than applicants chosen to fill positions for which she applied.

### 2. *Adequacy of Fuller's* **prima facie** *case*

The court notes that, for the most part, the parties' arguments concerning summary judgment on Fuller's race discrimination claim do not address the allegations of racially discriminatory conduct that are actually in Fuller's Complaint. Nevertheless, the court will

address whether Fuller has generated genuine issues of material fact on her race discrimination claims as framed in her Complaint and as framed in the parties' briefs on summary judgment.

A *prima facie* case of race discrimination, like a *prima facie* case of sex discrimination, requires proof of the following: (1) the plaintiff was a member of a protected class; (2) she was meeting the employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently. *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006); *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 913 (8th Cir. 2006); *Riser v. Target Corp.*, 458 F.3d 817, 820 (8th Cir. 2006). Similarly, to establish a *prima facie* case of discriminatory failure to promote, the plaintiff must show the following: (1) she was a member of a protected group; (2) she was qualified and applied for a promotion to an available position; (3) she was rejected; and (4) a similarly-situated candidate, not part of the protected group, was hired for the position instead. *Pope*, 406 F.3d at 1007.[6] Again, Alliant contends that Fuller cannot make the necessary showings of "qualification" or "different treatment" of similarly situated whites.

For essentially the same reasons that the court held, above, that Fuller has not generated genuine issues of material fact on the "qualification" element of her *prima facie*

---

[6]Again, to establish a *prima facie* failure-to-promote claim, a plaintiff must ordinarily show that she applied for the promotion and was rejected, *McClure*, 447 F.3d at 1135 (citing *Lockridge*, 315 F.3d at 1010), but a plaintiff may establish a *prima facie* case even without an application for the position, if the employer's discriminatory practices make application futile. *Id.* at 1136 (citing *International Bhd. of Teamsters*, 431 U.S. at 367-68). Fuller contends that she applied for at least ten positions in Human Resources, and while Alliant disputes the number of positions for which Fuller applies, Alliant does not dispute that Fuller applied for some positions. Thus, this requirement is met as to Fuller's claim of a racially discriminatory failure to promote her.

case of sex discrimination, the court also concludes that Fuller has not generated genuine issues of material fact on the "qualification" element of her *prima facie* case of race discrimination. Fuller's absenteeism problems and frequent counseling for those problems demonstrate that she was not actually performing her job at a level that met her employer's legitimate expectations. *See Greer*, 185 F.3d at 921 (in an ADA case, finding that the plaintiff was not "qualified" because of her excessive absences, because "'regular and reliable attendance is a necessary element of most jobs'") (quoting *Halperin*, 128 F.3d at 198).

Nor is Fuller's showing on the "different treatment" element of her *prima facie* case of race discrimination any more adequate than her showing on that element of her *prima facie* case of sex discrimination. To prove this element of her *prima facie* case of race discrimination, as to failure to promote, Fuller must show that the whites promoted instead of her were less qualified than she was. *See McCullough v. Real Foods, Inc.*, 140 F.3d 1123, 1128-29 (8th Cir. 1998) (an inference of race discrimination arises when a substantially less qualified white person is promoted over a substantially better qualified black person). To prove the last element of her *prima facie* case of race discrimination, as to disparate discipline, Fuller must "show that similarly situated employees were 'involved in or accused of the same or similar conduct and [were] disciplined in different ways.'" *Green*, 459 F.3d at 913 (quoting *Rodgers*, 417 F.3d at 851). Here, Fuller has not produced any evidence that the two white males promoted to positions that she purportedly sought were less qualified than she was, resting instead on the bare assertion that her master's degree and experience qualified her for the positions she sought. Fuller also concedes that she does not know the absenteeism records of any white employees, so she cannot point to any similarly situated white employees with comparable attendance problems who were treated differently. Even if Fuller could identify one instance in which

a white employee was not disciplined for taking bereavement leave, such evidence would not be similar to the pattern of misuse of bereavement and other leave that Alliant has identified as one basis for its adverse treatment of Fuller. *See Turner*, 421 F.3d at 695 (isolated incidents of mistakes by male co-workers were not similar to the plaintiff's pattern of ignoring internal workplace responsibilities and deadlines that led to a negative performance review, so that the male co-workers were not similarly situated to the plaintiff). Nor has Fuller offered anything but conclusory assertions that whites were allowed to take personal calls, while she was disciplined for one instance when she was on a personal call when Armstrong monitored her line.

Thus, Fuller's *prima facie* case of race discrimination is inadequate as a matter of law.

### 3. *Pretext and inferences of discrimination*

Notwithstanding the conclusions above, in the alternative, the court will assume, for the sake of argument, that Fuller can generate genuine issues of material fact on the elements of her *prima facie* case of race discrimination, and the court will, therefore, consider the subsequent steps in the analysis of that claim. *See Twymon*, 462 F.3d at 935 (the court may assume, without deciding, that the plaintiff has established a *prima facie* case of race discrimination, and move on to consider the later stages of the analysis). At the later stages of the analysis, the employer must articulate a legitimate, non-discriminatory reason for its adverse actions toward the employee, and if the employer does so, the court must consider whether the plaintiff has both discredited the employer's asserted reasons for adverse action and shown that the circumstances permit drawing the reasonable inference that the real reason for that adverse action was the plaintiff's race. *Id.*; *Riser*, 458 F.3d at 820.

First, the court again finds that Alliant has, as a matter of law, proffered the necessary legitimate, non-discriminatory reasons for adverse employment actions, including failure to promote Fuller, by pointing to her absenteeism problems, her failure to provide adequate documentation to support requested leave (including submission of a FMLA certification on which Fuller had forged a doctor's signature), the superior qualifications of other employees selected to fill vacant positions, and Armstrong's discovery that Fuller was actually engaged in a private telephone conversation when Armstrong properly monitored her work phone. *Id.* (the employer must articulate a legitimate, non-discriminatory reason for its actions); *see also Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1037 (8th Cir. 2005) (holding that termination for excessive absences constituted a legitimate, non-discriminatory reason for adverse action). Thus, the question is whether Fuller can establish or generate genuine issues of material fact that Alliant's proffered reasons are pretexts for race discrimination.

Again, Fuller has identified no evidence carrying an inference of pretext or suggesting that discriminatory animus is the real reason for Alliant's actions. She has pointed to no evidence that other similarly situated individuals who were not in the plaintiff's protected class engaged in the same conduct or conduct of comparable seriousness, but were treated differently, nor any evidence that Alliant promoted substantially less qualified white persons to positions that Fuller sought. Again, "mere contentions" that supervisory employees "connived" to set up an employee for discharge or other adverse action are not sufficient to establish pretext or discriminatory animus, when the employee presents no evidence to support the contentions. *Al-Zubaidy*, 406 F.3d at 1037. That is precisely the circumstance here, because Fuller relies on nothing more than her opinion and speculation that Jubeck and others conspired to discharge her because of her race.

Therefore, Fuller's race discrimination claim, like her sex discrimination claim, fails, as a matter of law, because Fuller cannot generate genuine issues of material fact on either pretext or race-discriminatory animus for adverse employment actions against her.[7]

### E. Fuller's Disability Discrimination Claim

Finally, Alliant seeks summary judgment on Fuller's disability discrimination claim. Fuller did not mark the box on her Complaint indicating that she was asserting disability discrimination of the ADA. *See* Complaint (docket no. 40, Kansas District Court docket

---

[7]To the extent that Fuller's Complaint could be construed to assert hostile environment racial harassment, the court also finds that Fuller has failed to generate genuine issues of material fact on all of the elements of a *prima facie* case. *See Green*, 459 F.3d at 910 ("To establish a claim of [a racially] hostile work environment, a plaintiff 'must show (1) he [or she] belonged to a protected group; (2) he [or she] was subjected to unwelcome harassment; (3) the harassment was based upon race; (4) the harassment affected a term, condition, or privilege of his [or her] employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action.'") (quoting *Ross v. Douglas County*, 234 F.3d 391, 395-96 (8th Cir. 2000)). At the very least, Fuller has failed to generate genuine issues of material fact that any alleged harassment was "based upon race," rather than in response to her poor attendance, or that any harassment, if based on race, was sufficiently "severe or pervasive" to affect a term, condition, or privilege of employment. *See id.* ("The underlying wrongful conduct 'must be sufficient to create a hostile environment, both as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim.'") (quoting *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998)). While Fuller is quick to assign racially-hostile animus to any adverse action against her, she offers nothing but her speculation that such actions were motivated by such an animus, rather than by the legitimate, non-discriminatory reasons asserted by Alliant. Moreover, Fuller concedes that the only racial slurs that she has identified, by co-worker Nicole Sharp, were not directed at her, and those racial slurs are patently insufficient to show that the environment was "dominated by racial slurs," so as to constitute a racially hostile environment in violation of Title VII. *Id.* at 911.

no. 4) at 1.  Thus, the only indication in her Complaint that Fuller is asserting such a claim is her allegation that she "was discriminated against because of [her] illness." *Id.* at 4, ¶ 11.

### 1. *Arguments of the parties*

In support of its motion for summary judgment on this claim, Alliant contends that there is no evidence that Fuller is disabled within the meaning of the ADA.  Alliant points out that Fuller never identified a disability to Alliant, nor did she make any request for any kind of accommodation for a disability.  Moreover, Alliant points out that, at the time that Fuller's employment ended, she was seeking FMLA leave for her husband's alleged health problems, not her own.  Alliant also contends that, because of Fuller's extensive attendance problems, she cannot show that she was qualified for her position at Alliant.  Alliant also asserts the same legitimate, non-discriminatory reasons for its actions in response to this disability discrimination claim that Alliant asserted in response to Fuller's sex and race discrimination claims, *i.e.*, that Alliant took appropriate actions in response to Fuller's absenteeism, failure to provide adequate documentation for leave, workplace misconduct, and lack of qualification for positions to which Fuller sought promotion.  Finally, Alliant reiterates its prior arguments, in response to claims of other kinds of discrimination, that Fuller has produced no evidence that its adverse actions were a pretext for disability discrimination.  Fuller's brief in response to Alliant's motion for summary judgment contains no response to these arguments.

### 2. *Analysis*

#### a. *Abandonment of the claim*

First, the court finds that Fuller's failure to brief the question of the sufficiency of her disability discrimination claim constitutes abandonment of that claim.  *See, e.g., Moore-El v. Luebbers*, 446 F.3d 890, 899 n.2 (8th Cir. 2006) (a party abandoned an

argument by failing to brief it on appeal); *United States v. Zavala*, 427 F.3d 562, 565 n.1 (8th Cir. 2005) (although the plaintiff "mentioned" an issue in his brief, the court held that he had abandoned the issue by failing to provide any reasons or argument supporting his claim). Thus, based on Fuller's abandonment of her disability discrimination claim, Alliant is entitled to summary judgment on that claim.

### b. Sufficiency of the claim under the ADA

In the alternative, the court finds that this claim also fails as a matter of law. In order to establish a *prima facie* case of disability discrimination in violation of the ADA, the plaintiff must show the following: (1) she was disabled within the meaning of the ADA; (2) she was qualified to perform the essential functions of the job, with or without accommodation; and (3) she suffered an adverse employment action due to her disability. *Thompson v. Bi-State Dev. Agency*, ___ F.3d ___, ___, 2006 WL 2707639, *2 (8th Cir. Sept. 22, 2006) (citing *Darby v. Bratch*, 287 F.3d 673, 682 (8th Cir. 2002)). Fuller cannot establish or generate genuine issues of material fact on the first element of her *prima facie* case, however.

As the Eighth Circuit Court of Appeals has explained,

> The ADA defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A). "Whether an impairment substantially limits a major life activity is a threshold question." *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1206 (8th Cir. 1997). Evidence of a medical diagnosis of an impairment is insufficient. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002). The impairment must be substantial, that is, considerable or to a large degree. *Id.* at 196, 122 S. Ct. 681. An individual's major life activities are substantially limited if she is unable to perform a basic function the average person in the general population can

perform, or is significantly restricted in the condition, manner, or duration under which she can perform a major life activity as compared to an average person in the general population. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). "When the major life activity under consideration is that of working, ⋯ 'substantially limits' requires, at a minimum, [Samuels shows she is] unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999); see also Snow, 128 F.3d at 1207. "The inability to perform a single particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i).

*Samuels v. Kansas City Missouri Sch. Dist.*, 437 F.3d 797, 801-02 (8th Cir. 2006). Fuller has presented no evidence whatsoever that she suffers from a long-term or permanent disability. *See id.* at 802. Rather, the only evidence in the record is Dr. Zabner's confirmation that Fuller's "mild asthma," although "chronic," is not a serious medical condition that would impair her ability to work, *see* Defendant's Appendix at 103-05; thus, her asthma is not a "substantial" impairment that is disabling. *See Samuels*, 437 F.3d at 801 (the ADA requires proof of a "substantial" impairment). Fuller's contention that only she could determine whether her asthma prevented her from working on particular occasions is both self-serving and insufficient to establish that she suffered from a "substantial" impairment. *Compare Ollie v. Titan Tire Corp.*, 336 F.3d 680, 686-87 (8th Cir. 2003) (the plaintiff presented sufficient evidence that his asthma was either disabling or perceived to be disabling within the meaning of the ADA, in the form of medical restrictions on working around dust and fumes because of his asthma).

### c.     Sufficiency of the claim under the FMLA

Assuming, in the alternative, that Fuller's allegations that she was improperly denied leave for various absences that she contends were the result of her asthma could be

cognizable as claims of a violation of the FMLA, rather than the ADA, where she alleges discrimination on the basis of her "illness," such a claim would also fail as a matter of law. To prove a claim of interference with FMLA rights, "an 'employee must show only that he or she was entitled to the benefit denied.'" *Stallings v. Hussman Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006) (quoting *Russell v. North Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003)). However, an employer does not violate the FMLA by requiring an employee to provide certification that the requested leave qualifies as FMLA leave, *see* 29 C.F.R. § 825.305(b) ("[T]he employee must provide the requested [medical] certification to the employer within the time frame requested by the employer (which must allow at least 15 calendar days after the employer's request ), unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts."), and may deny FMLA leave if an adequate certification is never produced by the employee. *See* 29 C.F.R. § 825.311(b) ("If the employee never produces the certification, the leave is not FMLA leave."). Here, Alliant asserts that Fuller never provided adequate certification in support of her request for FMLA leave on September 29-30, 2003, because Dr. Zabner expressly advised Intracorp that Fuller's condition did not qualify for FMLA leave. Again, Fuller's contention that only she could determine whether her asthma prevented her from working on particular occasions is both self-serving and insufficient to establish that she suffered from a qualifying condition. Similarly, as a matter of law, Alliant was entitled to reject a certification of Fuller's leave in April and May 2004 to tend to her seriously ill husband, where that certification bore a falsified doctor's signature, and Fuller never provided an adequate certification. *See id*. Fuller has cited no authority that imposed upon Alliant an obligation to figure out who her husband's doctors were and to contact them on its own initiative in order to substantiate Fuller's claim for FMLA leave.

Thus, even if Fuller's claim for discrimination on the basis of "illness" is construed as a FMLA claim rather than an ADA claim, the claim fails as a matter of law.

### III. CONCLUSION

Even keeping in mind that summary judgment should seldom or rarely be granted in employment discrimination cases, *see, e.g., Crawford*, 37 F.3d at 1341; *Johnson*, 931 F.2d at 1244, the court concludes that this is one of those rare employment cases in which summary judgment is appropriate. This case involves precisely the kind of average or below-average worker—equally protected by Title VII, the ADA, the ADEA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., Riordan*, 831 F.2d at 697-98. Nevertheless, in this case, the undisputed evidence is all on one side, and both the arguments of the parties and the court's experience show that the plaintiff ultimately relies on nothing but speculation, not evidence, to attempt to generate genuine issues of material fact on required elements of her sex, race, and disability discrimination claims. *See* OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881) ("The life of the law has not been logic; it has been experience."). While the undersigned is as eager as any federal judge to enforce anti-discrimination laws, *where the evidence warrants*, the court also believes that membership in a protected class or engaging in protected activity does *not* insulate a "protected" employee from discipline for misconduct or deficient performance. *Cf. Arraleh v. County of Ramsey*, 461 F.3d 967, 977-78 (8th Cir. 2006) ("Engaging in protected activity does not insulate an employee from discipline for ⋯ disrupting the workplace.") (internal quotation marks and citations omitted). Here, the court finds that the plaintiff employee has failed to generate genuine issues of material fact that adverse employment actions against her were based on any "protected" characteristic.

THEREFORE, Alliant's March 8, 2006, Motion For Summary Judgment (docket no. 72), as amended by Alliant's May 19, 2006, Amended Motion For Summary Judgment (docket no. 80), is **granted** as to all claims asserted in Fuller's Complaint.

**Judgment shall enter accordingly.**

**IT IS SO ORDERED.**

**DATED** this 16th day of October, 2006.

_Mark W. Bennett_

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

A copy of this document has been mailed/faxed to all counsel of record, pro se parties and others listed and not shown as having been served electronically under the cm/ecf system:

by: /s/ des 10/16/06